40 A.3d 1066

**MONTGOMERY COUNTY, Maryland**

v.

**MARYLAND ECONOMIC DEVELOPMENT CORPORATION.**

No. 2673, Sept. Term, 2010.

Court of Special Appeals of Maryland.

March 30, 2012.

Scott R. Foncannon (Marc P. Hansen, Co. Atty., Karen L. Federman Henry, Division Chief on the brief), Rockville, MD, for appellant.

G. Vann Canada, Jr. (James J. Demma, Miles & Stockbridge PC, on the brief), Rockville, MD, for appellee.

Panel: KRAUSER, C.J., ZARNOCH, and WATTS, JJ.

**WATTS, J.**

This is an administrative appeal from a decision of the Maryland Tax Court (the "tax court") regarding a request for a refund of State recordation tax paid by appellee, the Maryland Economic Development Corporation ("MEDCO"). Appellant, Montgomery County, Maryland (the "County") denied the request for a refund and MEDCO appealed to the tax court. The tax court agreed with the County that no exemption applied and affirmed the denial of the refund. MEDCO petitioned for judicial review in the Circuit Court for Montgomery County. The circuit court reversed the tax court and remanded for further proceedings consistent with the circuit court's conclusion that the recordation tax falls within an exemption. The County noted a timely appeal, raising one issue, which we quote:

I.  Did the tax court properly interpret the law and find that MEDCO was not exempt from paying recordation tax on a deed of trust, where the tax is imposed on the privilege of recording the document and not on a particular party to the transaction?

We answer this question in the affirmative and, as such, we reverse and vacate the decision of the Circuit Court for Montgomery County with instructions to affirm the judgment of the Maryland Tax Court.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2009, MEDCO entered into a loan agreement with PNC Bank, National Association ("PNC Bank") in which MEDCO borrowed $3,300,000 from PNC Bank.[1] On March 26, 2009, MEDCO's Executive Director, Robert Brennan, signed a document titled "Leasehold Deed of Trust,[2] Assignment and

---

1.  The purpose of the loan was to "[r]etire and refinance existing indebtedness (bonds)," the repayment of which was secured by an encumbrance on one of MEDCO's projects known as the Maryland Technology Development Center.

2.  In *Wellington Co. Profit Sharing Plan & Trust v. Shakiba*, 180 Md.App. 576, 593–94, 952 A.2d 328 (2008), we defined deed of trust as follows:

Security Agreement." In this document, MEDCO was identified as the grantor, PNC Bank was identified as the bank, as well as the beneficiary of the Deed of Trust, and Richard Woo, who was listed at the same address as PNC Bank, was identified as the trustee. The Leasehold Deed of Trust, Assignment and Security Agreement contained the following provision:

14. *Expenses.* The performance of each and every obligation on the Grantor's part under the Loan Documents shall be at the sole expense of the Grantor, and neither the Bank nor the Trustee shall have any obligation for any such expenses. In addition to any other amounts required to be paid by the Grantor under the Loan Documents or with respect to the Property, the Grantor shall pay the following (collectively called the "**Expenses**"): (a) all filing, registration and recording costs and fees and all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessment and charges in connection with the recordation or filing of any Loan Documents or related instruments, and any documents in connection with any foreclosure. . . .

In April 2009, the Leasehold Deed of Trust, Assignment and Security Agreement, dated March 26, 2009, from MEDCO as

---

"A deed of trust to secure a debt is in legal effect a mortgage. It is a conveyance made to a person other than the creditor, conditioned to be void if the debt be paid at a certain time, but if not paid that the grantee may sell the land and apply the proceeds to the extinguishment of the debt, paying over the surplus to the grantor. It is in legal effect a mortgage with a power of sale, but the addition of the power of sale does not change the character of the instrument any more than it does when contained in a mortgage. Such a deed has all the essential elements of a mortgage; it is a conveyance of land as security for a debt. It passes the legal title just as a mortgage does, except in those states where the natural effect of a conveyance is controlled by statute; and in states where a mortgage is considered merely as a security, and not a conveyance, a trust deed is apt to be regarded in this respect just like a mortgage. Both instruments convey a defeasible title only; the mortgagee's or trustee's title in fee being in the nature of a base or determinable fee; and the right to redeem is the same in one case as it is in the other."
(Citations and emphasis omitted).

grantor for the benefit of PNC, was presented to the County Transfer Office for processing, prior to the deed being recorded among the County Land Records. At the time the deed of trust was presented, MEDCO claimed an exemption from the recordation tax pursuant to Md.Code Ann., Economic Development ("Econ.Dev.") § 10–129.[3] The Transfer Office denied the exemption and imposed the recordation tax.

On April 6, 2009, MEDCO filed a "Transfer/Recordation Tax Refund Claim" with the County Department of Finance and a request for a hearing. In the refund claim, MEDCO alleged it was improperly required to pay $31,450, representing the recordation tax on the deed of trust. MEDCO stated that it was entitled to a refund because the transaction involved the recording of a deed of trust, an act which was exempt from taxation based on MEDCO's tax-exempt status under State law.

On May 20, 2009, an administrative hearing was held on the refund claim. In a letter dated June 19, 2009, Timothy L. Jones, Tax Operations Manager, Division of Treasury, for the County, denied the request for a refund. The letter contained a section captioned the "Basis of Decision," which provided as follows:

> Recordation tax is an excise tax computable on the amount of consideration on the privilege of recording a document among the Land Records. . . . The taxes become due when the instrument of writing is presented for recording. . . . State law does not require any particular party to pay the recordation tax. The tax is imposed on the privilege of recording the document among the Land Records.

---

**3.** Econ. Dev. § 10–129, entitled "Tax status," provides:

(a) Exemption.—Except as provided in subsection (b) of this section, the Corporation is exempt from any requirement to pay taxes or assessments on its properties or activities, or any revenue from its properties or activities.

(b) Private entities.—Property that the Corporation sells or leases to a private entity is subject to State and local real property taxes from the time of the sale or lease.

(c) Bonds.—The bonds of the Corporation, including the interest on the bonds, are forever exempt from all State and local taxes.

The Tax–Property Article in Section 12–108 also lists several transactions that are exempt from recordation tax. There is an exemption that applies to a transfer to a state entity; however, there is no exemption that applies to a transfer from a state agency.

The Claimant has relied on the argument that because MEDCO's activities are exempt from tax, there is no tax due on this transfer. ( [Eco. Dev. §] 10–129) The reliance on this section is misplaced. The County agrees that MEDCO is exempt from the requirement to pay taxes on its property, activities, or any revenue derived from its property or activities. Because the recordation tax is not a tax on its property, activities or revenues, this general exemption from payment of taxes to MEDCO is not available to prevent imposition of the recordation tax on the recording of the Deed of Trust because the recordation tax is not imposed on a particular party. MEDCO may have contractually agreed to be responsible for the recordation tax, but that contractual commitment to pay a tax cannot create an exemption from recordation tax. Only the General Assembly can create an exemption from recordation tax. In this particular case, there is no exemption from recordation tax for transfers from a state agency to a private commercial lender.

MEDCO appealed to the tax court, and on May 10, 2010, the tax court issued a Memorandum and Order, agreeing with the County and denying the refund. The tax court explained, in pertinent part, as follows:

It is [MEDCO's] contention that when MEDCO borrowed money for this particular project in Montgomery County and those funds were secured by a Deed of Trust to PNC Bank, this action was an activity as referred to in [Econ. Dev. § 10–129(a) ]. [MEDCO's] theory of the case is that the recordation tax generated by recording the Deed of Trust from MEDCO to PNC Bank is exempt pursuant to [Econ. Dev. § 10–129(a).]

It is the [County's] position that there was no requirement in the statute that the grantor or a Deed of Trust pay

the recordation tax, and that the payment of that tax may be negotiated between the parties. That is to say, it is just as likely that PNC Bank could pay the recordation tax without the claim of any exemption. The [County] further argues that Section 12–108 of the Tax–Property Article, exempts from recordation tax, instruments of writing that transfers property to or grants a security interest to an agency of the State.

Lastly, Tax–Property Section 116, indicates that a governing body of a County may exempt, by law, from recordation tax an instrument of writing that transfers property from or grants a security interest from an agency of the State. Further evidence established by the [County] was that [the County] had not, by law, created an exemption as set forth in Sections 112–116, supra.

The interpretation of tax exemptions are to be strictly construed and resolved and any doubt found in the taxing authority's favor.... While [MEDCO] claims that the payment of the recordation tax in this matter is exempt under [Econ. Dev. § 10–129(a)], by virtue of the fact that this action was one of the Corporation's regular activities, strictly construing a tax exemption, this Court cannot find under Tax–Property Section 12–108 where [MEDCO] is specifically exempt from granting a secured interest to a private third party. In Tax–Property Section 12–116, the Legislature recognized that there was not a specific exemption from a recordation tax on an instrument of writing which transfers property or grants a security interest from an agency of the State and enables the governing bodies of the County, as well as the City of Baltimore the opportunity to grant an exemption if they saw fit. In this particular case, Montgomery County did not enact the legislation referred to above. Based on the specific exemptions contain[ed] in the Tax–Property Article and mindful of the law which requires the Court to narrowly construe tax exemptions and to resolve any doubt in the favor of the taxing authority, it is this 10th day of May, 2010, by the Maryland Tax Court

ORDERED that the Petition for Appeal is hereby **DE-NIED.**

On June 2, 2010, MEDCO filed a Petition for Judicial Review in the circuit court. On November 30, 2010, the circuit court held a hearing. On December 27, 2010, the circuit court issued an Order reversing and remanding the tax court's decision. On January 25, 2011, the County noted an appeal.

## DISCUSSION

The County contends that this Court should affirm the tax court's decision denying MEDCO an exemption from payment of the recordation tax in this case. In support of this contention, the County makes three overarching arguments: (1) "that MEDCO was not exempt from paying the recordation tax on a deed of trust, because the tax is imposed on the privilege of recording the document and not on a particular party to the transaction"; (2) "[n]either MEDCO's status as a State agency nor its enabling statute creates an exemption from payment of the recordation tax"; and (3) even if an exemption existed in this case, MEDCO waived its right to claim the exemption by entering into a consensual agreement with PNC Bank to pay the tax.

The County asserts that the Econ. Dev. § 10–129 exemption "applies only to the requirement to pay taxes or assessments on MEDCO's 'properties or activities' or the revenue from those properties or activities." The County points out that State law clearly identifies the activities of MEDCO that are exempt from taxes and "[a]lthough the loan transaction is within MEDCO's activities, recording the deed of trust is not a required step to effectuate the loan." The County maintains that the purpose of the recordation tax is for the privilege of recording a document among the land records, and it is not a tax on the property or activities of the borrower. The County points out that, pursuant to Md.Code Ann., Tax–Property Art. ("Tax–Prop") §§ 12–102 and 12–111, the tax is not imposed on a particular party to the transaction.

The County contends that "instruments of writing that transfer property or grant a security interest to the State or any agency of the State are exempt from payment of State recordation tax"; however, transfers of interest from the State or from an agency of the State are not exempt. The County contends that Tax–Prop. § 12–116 permits local governments to enact a law providing for an exemption from recordation tax when an interest is transferred from the State or agency. The County points out that it has not enacted such a law, exempting from the recordation tax transfers from the State or from a State agency. The County maintains that in enacting the recordation tax statute, the General Assembly carved out specific exemptions, and, as such, if the General Assembly sought to exempt MEDCO from paying recordation tax when transferring property it could have done so.

Alternatively, the County argues that if such an exemption exists, MEDCO "affirmatively waived that exemption by entering into a contract with PNC Bank and agreeing to pay the tax." The County asserts that the waiver occurred when MEDCO "voluntarily entered into an agreement with the bank to pay the tax when they believed they were otherwise exempt from payment of the tax. The voluntary act relinquishing its right to claim the exemption by contract with the bank created the waiver—not the objection to payment at the County's transfer office." The County points out the terms of the loan agreement between MEDCO and PNC Bank demonstrate that MEDCO "agreed that any expense incurred by the bank would be paid by MEDCO, including recording of security interests." The County contends that "[t]o allow MEDCO to pay the tax and then claim an exemption, however, has the effect of expanding the exemption to private parties engaged in a transaction with MEDCO." The County argues that the agreement MEDCO signed with PNC Bank "shifted only the economic responsibility for payment of the tax to MEDCO-the agreement did not shift the legal incidence of the tax to MEDCO." The County contends that the General Assembly "intended to exempt MEDCO only from taxes that it was

required to pay by law—not taxes that MEDCO agreed to pay or reimburse by contract."

MEDCO responds that the tax court "erred by failing to find that [it] is exempt from payment of the State recordation tax as a matter of law." MEDCO points out that it was created "for the purpose of stimulating economic growth, stimulating employment and to engage in the promotion of technological enterprise as enumerated in [Econ. Dev.] Section 10–104" and was empowered "to 'lease as lessee . . . real property . . . necessary to carry out its purpose[.]' " MEDCO asserts that as a result of its purpose, combined with its power to borrow money, and the "unlimited language contained in [Econ. Dev.] Section 10–129(a)," it is exempt from "all taxes or assessments on the property or activities of MEDCO, including the state recordation tax."

MEDCO argues that Econ. Dev. § 10–129 "specifically exempts the property and activities of MEDCO from taxation in any form." MEDCO argues that the tax court's strict construction of Econ. Dev. § 10–129 ignores the plain language of the statute and intent of the General Assembly.

MEDCO argues that the General Assembly is presumed to have full knowledge of existing law. Accordingly, MEDCO contends that "when the Legislature enacted subsections 10–117(a)(1) and (2) [4] it was aware that any mortgage or deed of trust securing payment of money borrowed by MEDCO to finance one of its activities would be recorded to achieve and maintain priority and enforceability over subsequent encumbrances. . . . As a consequence, if the Legislature had intended that the universal exemption from taxation contained in subsection 10–129(a) was not applicable to the state recordation tax, it would have so provided." MEDCO argues that by

---

4. Econ. Dev. § 10–117(a)(1) and (2) provide:
    (a) In general.—The Corporation may:
       (1) borrow money and issue bonds to finance any part of the cost of a project or for any other corporate purpose of the Corporation;
       (2) secure the payment of any portion of the borrowing by pledge of or mortgage or deed of trust on property or revenues of the Corporation;

enacting Tax–Prop. § 12–111—which permits the recordation tax to be paid by any person—the General Assembly "must have envisioned the possibility that an entity which was by statute exempt from payment of state recordation tax would be contractually obligated to pay all expenses related to a mortgage loan resulting in no tax being paid."

MEDCO contends that it "did not voluntarily waive the statutory exemption absolving it from the payment of the State recording tax." MEDCO argues that the record demonstrates that it at no point waived the exemption and at all times asserted that it was exempt from paying the recordation tax. MEDCO argues that it involuntarily paid the recordation tax, as the deed of trust would not be recorded in the land records had MEDCO refused, and after paying the tax, MEDCO immediately applied for a refund.

### (1) Standard of Review

The Maryland Tax Court is an administrative agency, and as such, final orders of the tax court are subject to judicial review. Md.Code Ann., Tax–General Art. § 3–102; Md.Code Ann., State Gov't Art. § 10–222; *Supervisor of Assessments of Anne Arundel County v. Hartge Yacht Yard, Inc.,* 379 Md. 452, 460–61, 842 A.2d 732 (2004). When reviewing the decision of an administrative agency, "we employ the same statutory standards as would the Circuit Court; the inquiry is whether the administrative agency erred, not whether the Circuit Court erred." *Comptroller of the Treasury v. Phillips,* 384 Md. 583, 590, 865 A.2d 590 (2005).

"The standard of review for Tax Court decisions is generally the same as that for other administrative agencies." *Hartge Yacht Yard,* 379 Md. at 461, 842 A.2d 732. "[U]nder this standard, a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." *Id.* The Court of Appeals has explained that an agency's "legal interpretations of the statute it administers are entitled to some deference." *Phillips,* 384 Md. at 591, 865 A.2d 590. "[W]here the Tax

Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision." *Hartge Yacht Yard,* 379 Md. at 461, 842 A.2d 732.

### (2) MEDCO

In 1984, the General Assembly created MEDCO, "Maryland Code (1957, 1982 Repl.Vol., 1985 Supp.), Article 41, §§ 558 through 573, as a public corporation with the objective of promoting economic development within the state." *Atlantic Golf, Ltd. P'ship v. MEDCO,* 377 Md. 115, 117, 832 A.2d 207 (2003). Pursuant to Econ. Dev. § 10–105, MEDCO is an "instrumentality of the State."

Enacted in its present form on October 1, 2008, Econ. Dev. § 10–104, entitled "Legislative findings; purposes; intent," contains language derived without substantive change from former Art. 83A, § 5–202, concerning the purpose of MEDCO, and provides as follows:

(a) Findings.—The General Assembly finds that:

(1) the State's economy continues to experience technological change and restructuring;

(2) technological change may result in economic contraction and dislocation, but affords opportunities to expand productive employment and expand the State's economy and tax base;

(3) the establishment of a public corporation to acquire or improve projects:

(i) serves the public interest by accomplishing one or more of the Corporation's legislative purposes listed in subsection (b) of this section; and

(ii) complements existing State marketing programs administered by the Department and through the Department's financial assistance programs including the Maryland Industrial Development Financing Authority and the Maryland Economic Development Assistance Authority under Title 5 of this article; and

(4) the State lacks and needs direct property development capability for economic development purposes.

(b) Purposes.—The legislative purposes of the Corporation are to:

(1) relieve unemployment in the State;

(2) encourage the increase of business activity and commerce and a balanced economy in the State;

(3) help retain and attract business activity and commerce in the State;

(4) promote economic development; and

(5) promote the health, safety, right of gainful employment, and welfare of residents of the State.

(c) Intent.—The General Assembly intends that:

(1) the Corporation operate and exercise its corporate powers in all areas of the State;

(2) without limiting its authority to otherwise exercise its corporate powers, the Corporation exercise its corporate powers to assist governmental units and State and local economic development agencies to contribute to the expansion, modernization, and retention of existing enterprises in the State as well as the attraction of new business to the State;

(3) the Corporation cooperate with workforce investment boards, private industry councils, representatives of labor, and governmental units in maximizing new economic opportunities for residents of the State;

(4) the Corporation accomplish at least one of the purposes listed in subsection (b) of this section and complement existing State marketing and financial assistance programs by:

(i) owning projects;

(ii) leasing projects to other persons; or

(iii) lending the proceeds of bonds to other persons to finance the costs of acquiring or improving projects that the persons own or will own; and

(5) the Corporation not own and operate a project unless:

(i) the Board determines by resolution that the private sector has not demonstrated serious and significant interest and development capacity to own and operate the project; or

(ii) a representative of a governmental unit requests in writing that the Corporation own and operate the project.

The powers of MEDCO are stated in Econ. Dev. §§ 10–115 through 10–117. Borrowing money is a power set forth in Econ. Dev. § 10–117, which provides, in pertinent part, as follows:

(a) In general.—The Corporation may:

(1) borrow money and issue bonds to finance any part of the cost of a project or for any other corporate purpose of the Corporation;

(2) secure the payment of any portion of the borrowing by pledge of or mortgage or deed of trust on property or revenues of the Corporation;

. . .

(4) otherwise provide for the security of bonds and the rights of bondholders.

MEDCO's tax status in the State is set forth in Econ. Dev. § 10–129, which provides:

(a) Exemption.—Except as provided in subsection (b) of this section, the Corporation is exempt from any requirement to pay taxes or assessments on its properties or activities, or any revenue from its properties or activities.

(b) Private entities.—Property that the Corporation sells or leases to a private entity is subject to State and local real property taxes from the time of the sale or lease.

(c) Bonds.—The bonds of the Corporation, including the interest on the bonds, are forever exempt from all State and local taxes.

### (3) The Recordation Tax

The State recordation tax is "in the nature of an excise tax imposed upon the privilege of recording certain instruments, including, among other things, the transfer of title to real property," and is not a tax on the property itself. *Dean v. Pinder*, 312 Md. 154, 165, 538 A.2d 1184 (1988) (citation omitted). "A property tax is a charge on the owner of the property by reason of his ownership alone without regard to any use that might be made of it .... [while] the modern conception of an excise tax includes any tax not levied directly on the ownership of property as such."[5] *Montgomery Cty. v. Waters Landing Ltd. P'ship*, 99 Md.App. 1, 14, 635 A.2d 48, *aff'd*, 337 Md. 15, 650 A.2d 712 (1994) (citations and internal quotation marks omitted). The authority for the State recordation tax is set forth in Tax–Prop. § 12–102, which provides:

> Except as otherwise provided in this title, recordation tax is imposed on an instrument of writing:
>
> > (1) recorded with the clerk of the circuit court for a county; or
> >
> > (2) filed with the Department and described in § 12–103(d) of this title.

"By agreement, [the] recordation tax may be paid by any person." Tax–Prop. § 12–111. The General Assembly has carved out several exemptions to the State recordation tax, the most relevant being Tax–Prop. § 12–108(a) which provides that:

> (a) Transfers to public agency.—

---

**5.** "The line that separates an excise tax from a property tax is a difficult one to draw, and courts have not fully succeeded in developing a truly useful definition of either concept. A three-part test, however, has been developed to help distinguish between property and excise taxes, which is: (1) the designation placed on the tax by the legislature; (2) the subject matter of the tax; and (3) the incidents of the tax, i.e., the manner in which it is assessed and the measure of the tax." *Montgomery Cty. v. Waters Landing Ltd. P'ship*, 99 Md.App. at 13, 635 A.2d 48 (citations omitted).

(1) Except as provided in paragraph (2) of this subsection, an instrument of writing is not subject to recordation tax, if the instrument of writing transfers property to or grants a security interest to:

    (i) the United States;

    (ii) the State;

    (iii) an agency of the State; or

    (iv) a political subdivision in the State.

(2) The Mayor and City Council of Baltimore City or the governing body of a county may impose, by law, the recordation tax uniformly on all instruments of writing that secure repayment of debt created by the sale of bonds authorized under Title 12, Subtitle 1 of the Economic Development Article.

Pursuant to Tax–Prop. § 12–116, a county may enact its own law exempting from the recordation tax an instrument of writing that transfers property from or grants a security interest from a State or State agency. Tax–Prop. § 12–116 provides that:

The Mayor and City Council of Baltimore City or the governing body of a county may exempt, by law, from the recordation tax an instrument of writing that transfers property from or grants a security interest from:

    (1) the United States;

    (2) the State;

    (3) an agency of the State; or

    (4) a political subdivision in the State.

### (4) Econ. Dev. § 10–129 and Tax–Prop. §§ 12–108, 12–111, 12–116

This case involves the interaction between Econ. Dev. § 10–129(a)[6] and Tax–Prop. § § 12–108, 12–111 and 12–116. We

---

**6.** Econ. Dev. § 10–129(b) provides that: "Property that the Corporation sells or leases to a private entity is subject to State and local real property taxes from the time of the sale or lease." This section is not relevant to this case as no property was sold or leased to PNC Bank.

must, therefore, apply the canons of statutory construction to the statutes. In *Md.–Nat'l Capital Park & Planning Comm'n v. State Dept. of Assessments and Taxation*, 110 Md.App. 677, 688–90, 678 A.2d 602 (1996), *aff'd*, 348 Md. 2, 702 A.2d 690 (1997), we explained the standard by which we interpret tax exemptions as follows:

> If, as in the instant case, the parties call upon us to interpret an exemption, we first look to the general principles of statutory construction, and then, narrowing our inquiry, turn to those principles that are applicable to the taxation arena. Ever mindful of our desire to discern and effectuate the General Assembly's intent, we examine the language of the enactment and give to the language its natural and ordinary import. If the language is plain and free from ambiguity and expresses a definite and sensible meaning, we will, ordinarily, end our inquiry. We are not, however, rigidly bound to the precepts of the "plain meaning" rule. Where the General Assembly has chosen not to define a term used in a statute, we will give that term its ordinary and natural meaning and will not resort to subtle or forced interpretations for the purpose of extending or limiting the operation of the statute. Furthermore, we examine the entire statutory scheme and consider the purpose behind the particular statute before us. Cognizant that the language of the statute is the foundation from which our inquiry commences, we also review legislative history and the prior state of law, and contemplate the particular evil, abuse, or defect that the General Assembly wished to remedy with the enactment of the statute at issue. Moreover, the examination of related statutes is not beyond our reach.
>
> . . . .

In *Suburban Propane Gas Corp. v. Tawes*, 205 Md. 83, 87, 106 A.2d 119 (1954), Judge Collins recited for the Court of Appeals the judicial approach towards interpreting tax exemptions.

> Of course, tax exemption statutes are to be strictly construed in favor of the State. The taxing power is never

presumed to be surrendered. Every assertion that it has been relinquished must, to be effective, be distinctly supported by clear and unambiguous legislative enactment. To doubt an exemption is to deny it. However, the tax exemption statute should not receive a strained or unreasonable construction that would defeat the purpose of the legislative enactment.

In the final analysis, the real legislative intent prevails. The burden of showing that an exemption is allowed under the law falls upon the claimant.

(Most internal citations omitted). When interpreting a statute, "we presume that the Legislature has acted with full knowledge of prior legislation, and construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 420, 918 A.2d 470 (2007); *Mayor of Oakland v. Mayor of Mountain Lake Park*, 392 Md. 301, 316–17, 896 A.2d 1036 (2006) ("In construing statutes, we presume that the General Assembly acted with full knowledge of prior legislation and intended statutes affecting the same subject matter 'to blend into a consistent and harmonious body of law.' Therefore, we read together statutes on the same subject and harmonize them to the extent possible, so as to avoid rendering either statute 'or any portion, meaningless, surplusage, superfluous or nugatory.'" (internal citations omitted)).

### (A) Plain Language

### (i) Econ. Dev. § 10–129(a)

Econ. Dev. § 10–129(a) provides, as follows:

(a) Exemption.—Except as provided in subsection (b) of this section, the Corporation is exempt from any **requirement** to pay taxes or assessments on its properties or

activities, or any revenue [7] from its properties or activities. (Emphasis added).

A review of the plain reading of the language of Econ. Dev. § 10–129(a) demonstrates that the General Assembly sought to exempt MEDCO from any requirement to pay taxes or assessments on its properties or activities, or any revenue from its properties or activities. A plain language analysis of Econ. Dev. § 10–129(a) reveals that MEDCO is exempt from payment of taxes imposed on its real property and activities and taxes imposed on the income from those properties or activities. If MEDCO is required to pay a tax or assessment on its properties or activities or revenue therefrom, then MEDCO is exempt; conversely, if MEDCO is not required to pay the tax, it is not exempt. Nothing in the statute provides that MEDCO is exempt from paying a tax which it was not required to pay but agreed to pay or from paying an excise tax on the transfer of a security interest to a private entity, such as PNC Bank.

### (ii) Tax–Prop. §§ 12–108(a), 12–116 and 12–111

Tax–Prop. § 12–108(a) provides as follows:

(a) Transfers to public agency.—

(1) Except as provided in paragraph (2) of this subsection, an instrument of writing is not subject to recordation tax, if the instrument of writing transfers property to or grants a security interest to:

(i) the United States;

(ii) the State;

(iii) an agency of the State; or

(iv) a political subdivision in the State.

---

**7.** Econ. Dev. § 10–101 defines revenues as "the income, revenue, and other money the Corporation receives from or in connection with a project, and all other incomes of the Corporation, subject to § 10–115(11) of this subtitle." " 'Revenues' includes grants, rentals, rates, fees, and charges for the use of the services furnished or available." Econ. Dev. § 10–101.

(2) The Mayor and City Council of Baltimore City or the governing body of a county may impose, by law, the recordation tax uniformly on all instruments of writing that secure repayment of debt created by the sale of bonds authorized under Title 12, Subtitle 1 of the Economic Development Article.

Tax–Prop. § 12–116, provides:

The Mayor and City Council of Baltimore City or the governing body of a county may exempt, by law, from the recordation tax an instrument of writing that transfers property from or grants a security interest from:

(1) the United States;

(2) the State;

(3) an agency of the State; or

(4) a political subdivision in the State.

█ Through the plain meaning of its terms, Tax–Prop. § 12–108(a) specifically provides that when an instrument of writing transfers property **to,** or grants a security interest **to,** a State agency, such as MEDCO, the instrument of writing is exempt from the recordation tax. Conversely, Tax–Prop. § 12–116 specifically addresses instruments of writing which transfer property **from** a State agency, such as MEDCO. Tax–Prop. § 12–116 permits counties, such as Montgomery County, to enact a law which exempts from the recordation tax an instrument of writing that transfers property **from,** or grants a security interest **from,** a State agency. It is undisputed that Montgomery County has not enacted such a provision.[8] As such, there is no law exempting from the recordation tax an instrument of writing that transfers property from or grants a security interest from a State agency.

Tax–Prop. § 12–111 provides that: "By agreement, recordation tax may be paid by any person." "Agreement" is defined as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future

---

8. At oral argument, the County confirmed that it has not enacted a statute pursuant to Tax–Prop. § 12–116.

performances[.]" Black's Law Dictionary 74 (8th ed.2004). "Agreement" is also defined as "an arrangement as to a course of action[.]" Merriam–Webster's Collegiate Dictionary 26 (11th ed.2003). "May" is defined as "to be permitted to" or "[t]o be a possibility[.]" Black's Law Dictionary 1000 (8th ed.2004). "May" is also defined as " 'have power, am able,' 'have the ability to,' 'be free to.' " Merriam–Webster's Collegiate Dictionary 767 (11th ed.2003).

In sum, the plain language of Tax–Prop. § 12–111 demonstrates that recordation tax may be paid by either party, and the parties are able to agree as to who will pay the tax. From the language of Tax–Prop. § 12–111, MEDCO is clearly not mandated or required to pay the recordation tax, as the tax "may be paid by any person." A plain language review of Econ. Dev. § 10–129, Tax–Prop. §§ 12–108(a), 12–116, and 12–111 does not support the conclusion that MEDCO is exempt from paying the recordation tax in this case-a tax which it was not required to pay but voluntarily agreed to pay.

### (B) Legislative History

The legislative history of Econ. Dev. § 10–129, Tax–Prop. §§ 12–108(a), 12–116, and 12–111 compels the conclusion that MEDCO is not exempt from paying the recordation tax in this case.

### (i) Econ. Dev. § 10–129

Econ. Dev. § 10–129 was first enacted in 1984, by Article 41 § 567, which provided that:

With the exception of the State and local real estate taxes as required below, the Corporation **shall not be required to pay any taxes or assessments** upon its properties or activities or upon any revenues therefrom; provided however that whenever the Corporation sells or leases land or facilities to any private entity or entities, such land or facilities shall be subject to State and local property taxes from the time of such sale or lease. The bonds of the Corporation and the interest thereon are forever exempt from all State, municipal, and local taxation.

(Emphasis added).  In 1984, Senate Bill 485, Chapter 498 provided the purpose of Article 41 § 567 as follows:

> FOR the purpose of providing for the creation and organization of a public corporation to be known as the Maryland Economic Development Corporation for certain economic development purposes;  making certain legislative findings and expressions of intent;  defining certain terms;  ... stating the applicability of certain State and local laws, regulations, or approvals to the activities of the corporation; ... providing that, subject to certain exceptions, the corporation is exempt from State or local taxation or assessments;  ... and generally relating to the creation, organization, powers, and limitations of the Maryland Economic Development Corporation.

In 2008, Article 83A § 5–210 [9] was recodified to Econ. Dev. § 10–129 by Chapter 306 § 2 into its current form.[10]  Econ. Dev. § 10–129(a) provides as follows:

> (a) Exemption.—Except as provided in subsection (b) of this section, the Corporation **is exempt from any requirement to pay taxes or assessments on its properties or activities, or any revenue** from its properties or activities.

(Emphasis added).

A review of the statute from 1984, Article 41 § 567, to the 2008, Econ. Dev. § 10–129, reveals that MEDCO is exempt only from taxes it is **required** to pay upon its properties or activities.  Article 41 § 567 and Econ. Dev. § 10–129 demonstrate a clear intention to exempt MEDCO from paying taxes

---

9. In 1998, the language of Article 41 § 567 was contained in Article 83A § 5–210.

10. The Revisor's Notes stated that the section was "new language derived without substantive change from former Art. 83A, § 5–210." House Bill 1050, Chapter 306 of 2008, provided that the recodification was:

> FOR the purpose of adding a new article to the Annotated Code of Maryland, to be designated and known as the "Economic Development Article", to revise, restate, and recodify the laws of the State relating to the Department of Business and Economic Development. . . .

which it is required to pay, not taxes, such an excise tax for the benefit of a lender, which, pursuant to Tax–Prop. § 12–111, can be paid by either party.

### (ii) Tax–Prop. §§ 12–108(a), 12–111 and 12–116

The general recordation tax was enacted in 1937, and was contained in Section 213, which provided:

A tax is hereby imposed upon every instrument of writing recorded or offered for record with the Clerks of the Circuit Courts of the respective Counties, or the Clerk of the Superior Court of Baltimore City, on and after June 1, 1937, to and including September 30th, 1939, including mechanics liens, deeds, mortgages (except purchase money mortgages), chattel mortgages, bills of sale, conditional contracts of sale, leases, confessed judgments, magistrates' judgments, crop liens, deeds of trust, and any and all other instruments of writing, so recorded or offered for record, which create liens or incumbrances on real or personal property, or convey title to real or personal property; provided, however, that said tax shall not apply to assignments of mortgages, purchase money mortgages, absolute or partial releases, or orders of satisfaction. . . .

In 1945, in Senate Bill 160, Chapter 253, the recordation tax law was amended to include the following language, which was contained in Section 220:

A tax is hereby imposed upon every instrument of writing conveying title to real or personal property, or creating liens or incumbrances upon real or personal property, offered for record and recorded in this State with the Clerks of the Circuit Courts of the respective counties, or the Clerk of the Superior Court of Baltimore City, **provided that conveyances to the State or any agency thereof or any political sub-division of the State shall not be subject to the tax or charge imposed by this Section.** The term "instruments of writing" shall include deeds, mortgages, chattel mortgages, bills of sale, leases, deeds of trust, contracts and agreements, but shall not include mechanics liens, crop liens, purchase money mortgages, assignments of mortgag-

es, conditional sales contacts, judgments, releases or orders of satisfaction. . . .

(Emphasis added). This was the first appearance of language exempting conveyances to the State or any agency thereof or any political sub-division of the State from the recordation tax. This law was to take effect June 1, 1945.

In 1982, in House Bill 1301, Chapter 698, Md.Code Ann., Art. 81, § 277 was amended, in pertinent part, to include the following language:

(a)(3)(I) Except as otherwise provided in this paragraph, the recordation tax does not apply to conveyances to:

1. This State;

2. An agency of this State; or

3. Any political subdivision of this State.

(II) A local governing body, by ordinance or resolution, may apply the recordation tax to mortgages, deeds of trust, or other conveyances that secure the repayment of any indebtedness, funded in any part, directly or indirectly, from the proceeds of bonds issued under Article 41, §§ 266A, et seq. of the Code (relating to industrial buildings for counties and municipalities). If the local governing body passes such an ordinance or resolution, the tax shall be applied uniformly to every conveyance described in this subparagraph.

The purpose of this amendment was to

authoriz[e] any local governing body, by ordinance or resolution, to apply the recordation tax to the conveyance of properties funded in any part through the issuance of certain bonds, **even if the conveyance is to a political subdivision or would otherwise have been exempt from the recordation tax;** and requiring any local governing body so applying the recordation tax to apply it uniformly to those conveyances.

(Emphasis added).

In the 1987, Cumulative Supplement to the 1957, Md.Code Ann., Art. 81, §§ 277–277B were repealed and recodified into Tax–Prop. § 12–108 by Acts 1985, Senate Bill 1, Chapter 8,

Section 1, effective February 1, 1986. In 1986, Tax–Prop. § 12–108(a) provided:

(a) Transfers to public agency.

(1) Except as provided in paragraph (2) of this subsection, an instrument of writing is not subject to recordation tax, if the instrument of writing transfers property to or grants a security interest to:

(i) the United States;

(ii) the State;

(iii) an agency of the State; or

(iv) a political subdivision in the State.

(2) The Mayor and City Council of Baltimore City or the governing body of a county may impose, by law, the recordation tax uniformly on all instruments of writing that secure repayment of debt created by the sale of bonds authorized under Article 41 §§ 266A through 266–I of the Code.[11]

The Revisor's Notes following Tax–Prop. § 12–108(a) provided, in pertinent part, that:

Subsections (a) through (q) of this section are new language derived without substantive change from former Art. 81, § 277(a)(2)(ii), (3) and (1), as that paragraph related to the exemptions for vehicles and vessels, and (b)(2), (j), and the second sentence of (t) and as those subsections related to exemptions from tax, (h), and (i), and § 277(e) as that subsection related to recordation tax.

. . .

In subsection (a) of this section, the defined term "instrument of writing" is substituted for the former words "con-

---

**11.** Tax–Prop. § 12–108(a)(2) was subsequently amended to provide:

(2) The Mayor and City Council of Baltimore City or the governing body of a county may impose, by law, the recordation tax uniformly on all instruments of writing that secure repayment of debt created by the sale of bonds authorized under **Title 12, Subtitle 1 of the Economic Development Article.**

(Emphasis added).

veyances" and "mortgages, deeds of trust, or other convey-
ances", for clarity.

In the introductory language of subsection (a)(1) of this
section, the reference to if the instrument of writing "grants
a security interest to" is added for clarity.

. . .

Also in subsection (a)(2) of this section, the reference to
imposition of the tax "uniformly" is substituted for the
former, lengthy reference to "the tax shall be applied uni-
formly to every conveyance described in this subpara-
graph", for clarity.

Also in subsection (a)(2) of this section, the reference to
"debt created by the sale" of bonds is substituted for the
former phrase "funded in any part, directly or indirectly
from the proceeds" of bonds, for clarity.

In Senate Bill 1, Chapter 8, the stated purpose of Tax–Prop.
§ 12–108(a) was as follows:

FOR the purpose of adding a new Article to the Annotated
Code of Maryland, to be designated and known as the "Tax–
Property Article", to revise, restate, and recodify the laws of
the State relating and pertaining to property tax, recorda-
tion tax, and transfer tax matters generally . . . revising the
laws relating to recordation tax, including imposition, ex-
emptions, rate, calculation, payment, and administration,
and to distribution of recordation tax; . . . revising the laws
relating to procedures for property tax, recordation tax, and
transfer taxes, including returns and records, determination
of liability and enforcement, appeal and judicial procedures,
interest, additions to tax and assessable penalties, collection,
tax sales, tax abatements, tax credits, refunds, crimes and
offenses, and limitations; . . . .

In 2007, in House Bill 231, Chapter 384, the General Assem-
bly enacted Tax–Prop. § 12–116, as it is in its current form.
The purpose of the enactment was:

FOR the purpose of authorizing the Mayor and City Council
of Baltimore City or the governing body of a county to
exempt from recordation tax certain instruments of writing

if the transferor is the United States, the State, an agency of the State, or a political subdivision of the State; and generally relating to exemptions from the recordation tax.

Senate Bill 1 added Tax–Prop. § 12–111, which provided: "By agreement, recordation tax may be paid by any person." [12] In Senate Bill 1, the Revisor's Note after Tax–Prop. § 12–111 provided that: "This section is new language added to conform to practice under the general provisions of [Md.Code Ann., Real Property Art.] § 1–104." [13]

The intent of the General Assembly in enacting Tax–Prop. § 12–108(a) was to exempt instruments of writing which transfer property **to** or grants a security interest **to** the State or a State agency. The General Assembly specifically set forth an exemption for transfer **to** the State or a State agency. The General Assembly, however, starting in 2007, permitted individual counties to enact laws which would exempt from the recordation tax instruments of writing which transfer property **from** or grant a security interest **from** a State or State agency, which is the type of transaction at issue in this case. The General Assembly, by intent and express action, has left it for the individual counties to determine if they want to exempt transfers of property **from** or grants of a security interest **from** a State or State agency from the recordation tax. As stated above, Montgomery County has not enacted such a law.

---

**12.** Senate Bill 1 of 1985, defined "Person" as "an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, corporation, or other entity." Senate Bill 1 provided that this definition of person was "new language added to set forth a broad definition of the word 'person' as used in this article."

**13.** Md.Code Ann., Real Property Art. § 1–104, provides that the cost of recording may be paid by any person, by agreement. Md.Code Ann., Real Property Art. § 1–104 provides:

Any person may vary, by agreement, the effect of any provision in this article, except (1) as provided in this article, (2) the agreement may not affect the rights of persons not parties to or otherwise bound by the agreement, and (3) as provided by § 1–103 of this title.

■ In enacting Tax–Prop. § 12–111, the General Assembly demonstrated an intent to permit the recordation tax to be paid by any person by agreement. The purpose of Tax–Prop. § 12–111 was to streamline the payment of the recordation tax, with the payment of the costs of recording, which by agreement could be paid by any person. By enacting Tax–Prop. § 12–111, the General Assembly demonstrated an intent to neither impose the tax or require the tax to be paid by a specific person.

### (C) Precedent

### (i) Tax Exemptions

We will review relevant case law pertaining to tax exemptions for the payment of recordation taxes. In *Fed. Land Bank of New Orleans v. Crosland*, 261 U.S. 374, 377, 43 S.Ct. 385, 67 L.Ed. 703 (1923), the Supreme Court of the United States held that the Supreme Court of Alabama erred in dismissing a federal land bank's petition for mandamus to compel a recording officer of Alabama to accept a mortgage for recording without payment of the recordation tax. The Supreme Court held that under the Federal Farm Loan Act of 1916, the federal land bank was exempt from paying the recordation tax. *Id.* at 378–79, 43 S.Ct. 385. The Federal Farm Loan Act provided that "first mortgages executed to Federal Land Banks shall be deemed 'instrumentalities of the Government of the United States, and as such they and the income derived therefrom shall be exempt from Federal, State, municipal and local taxation." *Id.* at 377, 43 S.Ct. 385. The Supreme Court held that:

> The tax was sustained by the Supreme Court of [Alabama] and the petition for mandamus was ordered to be dismissed on the ground that the payment was optional; that the Federal Land Bank was not required to put its deed on record, and that if it did it must pay whatever others were required to pay for the registration of its security. But the case is not quite so simple as that. The law of Alabama does make it practically necessary to record such deeds,

because it overrides them if not recorded, in favor of any purchaser without notice. While it does so it cannot say that it leaves the Bank free to record or not. The Bank has a choice it is true, but so has one who acts under duress. *Id.* at 377–78, 43 S.Ct. 385. The Court concluded that: "It is said that the lender may collect the money in advance from the borrower. We do not perceive that this makes any difference. The statute says that the lender must pay the tax, but whoever pays it[,] it is a tax upon the mortgage and that is what is forbidden by the law of the United States." *Id.* at 378–79, 43 S.Ct. 385.

Relying on *Crosland,* the Court of Appeals of Maryland in *Pittman v. Home Owners' Loan Corp.,* 175 Md. 512, 2 A.2d 689 (1938), *aff'd,* 308 U.S. 21, 60 S.Ct. 15, 84 L.Ed. 11 (1939), held that a Home Owner's Loan Corporation was entitled to have a mortgage to it recorded without payment of the recordation tax.[14] The Supreme Court subsequently affirmed the Court of Appeals explaining that:

Petitioner suggests that the *Crosland* case may be distinguished; that the Alabama tax was imposed on the lender, whereas the Maryland tax is on the privilege of recording the instrument and the statute is silent as to the one who shall pay the tax; also that the Federal Farm Loan Act expressly declared the mortgages of Federal Land Banks to be instrumentalities of the Federal Government. The Court

---

**14.** The Home Owners' Loan Corporation tax status was as follows:

The Act of Congress creating the Home Owners' Loan Corporation, June 13th, 1933, ch. 64, sec. 1 *et seq.,* 48 Stat. 128, 12 U.S.Code Ann. ch. 12, secs. 1461–1468, contains the following tax exemption clauses: "The bonds issued by the Corporation under this subsection shall be exempt, both as to principal and interest, from all taxation (except surtaxes, estate, inheritance, and gift taxes) now or hereafter imposed by the United States or any District, Territory, dependency, or possession thereof, or by any State, county, municipality or local taxing authority. The Corporation including its franchise, its capital, reserves and surplus, and its loans and income, shall likewise be exempt from such taxation; except that any real property of the Corporation shall be subject to taxation to the same extent, according to its value, as other real property is taxed."

*Pittman v. Home Owners' Loan Corp.,* 175 Md. at 514–15, 2 A.2d 689.

of Appeals thought these differences to be immaterial. As to the first, the court rightly observed that in the *Crosland* case the provision for the payment of tax by the lender was regarded as having no determining significance. We said that "whoever pays it it is a tax upon the mortgage and that is what is forbidden by the law of the United States." 261 U.S., [at] pp. 378, 379, [43 S.Ct. 385]. Here, also, the tax is imposed upon the mortgage and is graded according to the amount of the loan, and the condition attached to the registration is a practical method of collection. The recording sought was for the protection of the interest of the Home Owners' Loan Corporation. In fact, the mortgage in the instant case was offered for record by the Corporation and the tax was demanded from the Corporation.

308 U.S. at 30–31, 60 S.Ct. 15 (footnote omitted).

Following these cases, however, in *Tawes v. Home Owners' Loan Corp.*, 180 Md. 401, 405, 24 A.2d 781 (1942), the Court of Appeals addressed whether the Home Owners' Loan Corporation was exempt from paying taxes, when, for the corporation's own protection, it paid the taxes on deeds to its purchasers, as any other prudent real estate dealer or agent would do. The Court held that the Home Owners' Loan Corporation was not entitled to a refund of certain recordation taxes and taxes on conveyances the corporation paid. *Id.* at 403, 406, 24 A.2d 781. The Court distinguished this case from *Pittman v. Home Owners' Loan Corporation*, 175 Md. 512, 2 A.2d 689, stating:

In the *Pittman Case, supra,* this court followed the decision in *Federal Land Bank of New Orleans v. Crosland,* 261 U.S. 374, 43 S.Ct. 385, 20 [29] A.L.R. 1, [67 L.Ed. 703,] which was an appeal from 207 Ala. 456, 93 So. 7 [ (1922) ]. In that case the State of Alabama had a statute imposing a recordation tax of 15 cents on each $100 of the principal sum secured to be paid for by the lender, with a penalty on any probate judge receiving a mortgage for record without collecting the "recording or registration tax," and it was there held that the Federal Land Bank of New Orleans was exempt from the payment of the tax. Our statute, Code, 1939, Art. 81,

Sec. 220, imposes a tax on deeds and mortgages, but is silent as to the person who should pay it. It says that the clerks shall collect the tax "for each instrument offered for record and recorded." The presentation for record is the act of the grantee, and the tax is based on the actual consideration paid or loaned. Section 220 exempts all purchase-money mortgages, which is meaningless as to the appellee's mortgages since the decision in the *Pittman Cases*, by which the appellee is exempt anyhow, and since then, no demand has been made for the payment of the tax on any of its mortgages. The practical reason advanced by the appellee for the avoidance of the tax on deeds made by it is that the properties are frequently sold at a loss. It is conceded that if the consideration for the deeds is paid to the appellee in full that the grantee would be obliged to pay the tax before his deed would be received for record, whether the land be sold at a profit or loss. The appellee may see that both deed and mortgage are presented for record, but in theory, at least, it presents the deed for record as the agent of the grantee. When a deed is presented for record it is the grantee's deed, not the grantor's. The latter has parted with it, even if it did take it to the court house for record, and there is no provision in the law that the grantor pay the tax. It is proper to assume that the grantor has added the recording fees and taxes to the expense and collected from the grantee.

*Tawes*, 180 Md. at 405–06, 24 A.2d 781.

In *Pittman v. Housing Authority of Baltimore City*, 180 Md. 457, 459, 25 A.2d 466 (1942), the Court of Appeals addressed whether the Housing Authority of Baltimore City was exempt from the State recordation tax. The Court held that the Housing Authority was not exempt because "here the Legislature has not conferred upon these agencies complete immunity from taxation, but has expressly delegated to the municipal officials the power to determine the sum to be paid by the Housing Authority in respect to any project and to agree to accept such sum in lieu of taxes." *Id.* at 462, 25 A.2d 466. In *Pittman v. Housing Authority of Baltimore City*, the

Housing Authority claimed it was exempt because of a Housing Authority law which stated that:

> The Act provides that "such property and an authority shall be exempt from all taxes and special assessments of the city, the State or any political subdivision thereof," provided that the authority shall pay to the city in lieu of taxes a sum for each housing project not exceeding an amount equal to "the regular taxes levied upon similar property."

180 Md. at 459, 25 A.2d 466.

Discussing tax exemptions, the Court of Appeals stated that:

> It is a firmly established principle of law that exemptions from taxation are not favored, but are strictly construed in favor of the State.... Therefore, before any claimant can obtain an exemption, it is incumbent upon him to show affirmatively that the alleged exemption has been clearly allowed by law. If there is a real doubt upon the subject, that doubt must be resolved in favor of the State. It is only where the deliberate purpose of the Legislature to grant an exemption is expressed in clear and unequivocal terms that a claim to an exemption can be maintained.
>
> . . . .
>
> But the intention of the Legislature as to the terms of the commutation must be entirely clear. No exemption will be held to result from any language of a statute which does not show an unmistakable intention of the Legislature to make the stipulated payment a substitute for the particular taxes for which the exemption is claimed. On the contrary, in case of doubt as to the legislative intention, the presumption is in favor of the taxing power and the burden is on the claimant to establish clearly his right to exemption by bringing himself clearly within the terms of the conditions imposed by the statute. 61 *C.J.*, *Taxation*, Secs. 388, 392, 395.

*Id.* at 460, 462, 25 A.2d 466 (internal citation omitted). Holding that the Housing Authority of Baltimore City was not

exempt from the recordation tax, the Court of Appeals stated that:

> **It is stated as a general rule that exemptions from taxation apply primarily to annual property taxes and ordinarily do not apply to excises or taxes which are imposed not in lieu of property taxes, but upon the enjoyment of a privilege.** *Knoxville & Ohio R. Co. v. Harris*, 99 Tenn. 684, 43 S.W. 115, 119, 53 *L.R.A.* 921 [ (1897) ]; 26 *R.C.L.*, *Taxation*, Sec. 276. A tax imposed upon the recording of a deed, even though computable on the amount of the consideration, is not a tax on property, but a privilege tax imposed upon the privilege of recording the deed. Such a tax does not conflict in any way with the levy of *ad valorem* taxes upon real estate. *Middendorf v. Goodale*, 202 Ky. 118, 259 S.W. 59 [ (1923) ]; *State v. Louisville & Nashville R. Co.*, 139 Tenn. 406, 201 S.W. 738, *Ann. Cas.* 1918D, 749 [ (1918) ]. Even constitutional provisions exempting public property from taxation are held to apply only to *ad valorem* taxes and not to license, franchise, occupation or excise taxes. *City of Birmingham v. State*, 233 Ala. 138, 170 So. 64 [ (1936) ]; *City of Louisville v. Cromwell*, 233 Ky. 838 [828], 27 S.W.2d 377 [ (1930) ]; *City of Greenville v. Query*, 166 S.C. 281, 164 S.E. 844 [ (1931) ], affirmed *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232, 84 A.L.R. 831 [ (1932) ].

180 Md. at 462–63, 25 A.2d 466 (emphasis added).

### (ii) Legal Incidence of the Tax

Maryland appellate courts have previously held that a tax exemption does not apply when the legal incidence of the tax fails to fall on the party who has the exempting tax status. For example, in *Vournas v. Montgomery Cty., Md.*, 53 Md. App. 243, 244, 452 A.2d 1263 (1982), *aff'd*, 300 Md. 123, 476 A.2d 705 (1984), this Court held that an individual owner of land that was previously assessed as farmland, was required to pay the County farmland transfer tax upon transfer by condemnation of that land to the United States. We explained that the tax imposed on the transfer of real property is an

excise tax, "similar to a sales tax in that it is imposed upon the occurrence of an event." *Id.* at 249–50, 452 A.2d 1263. Although Vournas argued that the transfer tax was not applicable to federal condemnation proceedings and violated the Constitution, this Court held that:

> In this case Vournas is furnishing land needed by the United States. The legal incidence of the transfer tax is upon Vournas, not the United States. Even if the economic burden by contract or otherwise, might somehow fall on the United States, the tax is nevertheless valid.
>
> The United States Constitution immunizes the United States and its property from taxation by the States, but it does not forbid a tax whose legal incidence is upon a person doing business with the United States, even though the economic burden of the tax, by contract or otherwise, is ultimately borne by the United States.

*Id.* at 250–51, 452 A.2d 1263 (citation omitted).

### (5) Analysis

Based on the plain language, the legislative history of the statutes, and the precedent explained above, we hold that MEDCO is not exempt from paying the recordation tax in this case, and affirm the decision of the tax court. Preliminarily, we note that tax exemption statutes are to be strictly construed in favor of the taxing authority and "[t]o doubt an exemption is to deny it." *Md.–Nat'l Capital Park & Planning Comm'n,* 110 Md.App. at 689, 678 A.2d 602 (citation omitted).

As the Court of Appeals stated in *Pittman v. Housing Authority of Baltimore City,* 180 Md. at 460, 462, 25 A.2d 466, no tax exemption will be held to result from any language of a statute which does not show an unmistakable intention of the General Assembly "to make the stipulated payment a substitute for the particular taxes for which the exemption is claimed." The plain language and legislative history of Econ. Dev. § 10–129 and Tax–Prop. § 12–108(a) fail to demonstrate any intention of the General Assembly to exempt MEDCO from paying a recordation tax where MEDCO records a deed

of trust for the benefit of a private lender, such as PNC Bank. In fact, Tax–Prop. § 12–116 specifically permits the individual counties to enact their own law regarding recordation tax exemptions for transfers from a State agency, and no such law has been enacted by Montgomery County. This certainly demonstrates that there is no "unmistakable intention" to create a tax exemption for transfers of property from, or grants of security interests from, a State agency, such as the transfer involved in this case.

The language and legislative intent of Econ. Dev. § 10–129 demonstrates an intent to exempt MEDCO from paying taxes on its property or activities. Although borrowing money is clearly an activity of MEDCO, the recording of the deed for the benefit of a private entity, *i.e.* PNC Bank, is not. Nothing in the plain language or legislative history of Econ. Dev. § 10–129 would permit us to extend MEDCO's tax exemption status to MEDCO's agreement to pay the recordation tax, in lieu of PNC Bank agreeing to pay the tax.

*Atlantic Golf,* 377 Md. at 117–18, 832 A.2d 207, a case in which the Court of Appeals discussed the purpose of MEDCO and the applicability of a tax surrender provision of the Maryland Constitution, is not dispositive of the issue in this case. In *Atlantic Golf,* 377 Md. at 117, 832 A.2d 207, the Court of Appeals addressed the applicability of the tax surrender provision provided in the Maryland Constitution, Article III, § 48 to a public corporation, such as MEDCO.[15] The

---

**15.** The Maryland Constitution, Article III, § 48 provides:

Corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes and except in cases where no general laws exist, providing for the creation of corporations of the same general character, as the corporation proposed to be created; and any act of incorporation passed in violation of this section shall be void. All charters granted, or adopted in pursuance of this section, and all charters heretofore granted and created, subject to repeal or modification, may be altered, from time to time, or be repealed; Provided, nothing herein contained shall be construed to extend to Banks, or the incorporation thereof. **The General Assembly shall not alter or amend the Charter, of any Corporation existing at the time of the adoption of this Article, or pass any other general or special law for the benefit of such Corpora-**

Court of Appeals held that the plain language and legislative history of the tax exemption surrender provision demonstrates that the "the tax exemption surrender provision is inapplicable to public corporations such as MEDCO and that, therefore, MEDCO is not required to relinquish its tax exemption as a result of the alterations to its enabling legislation." *Id.* at 123–24, 832 A.2d 207. In *Atlantic Golf,* 377 Md. at 118, 832 A.2d 207, "Anne Arundel County circulated a request for proposals to finance, construct, and operate a public golf course in the Pasadena area of the County." MEDCO responded to the request and Anne Arundel County selected MEDCO to develop the project. *Id.* at 118–19, 832 A.2d 207. MEDCO was to issue $17 million in tax-exempt revenue bonds, and use the proceeds to construct a golf course, operate the golf course for the County, and eventually turn the project over to the County when the bonds were paid off. *Id.* at 119, 832 A.2d 207. Prior to the issuance of the bonds, Atlantic Golf, "a limited partnership and private entity that owned a competing golf course in Anne Arundel County," challenged the issuance of the bonds "as an *ultra vires* act that was beyond the scope of MEDCO's enabling act[,]" claiming that the project

> exceeded MEDCO's then-existing statutory authorization on the grounds that: (1) the project was not located in an area of the state that was "experiencing significant economic dislocation or distress," as required by Maryland Code (1957, 1998 Repl.Vol.), Article 83A, § 5–202(c); (2) the private sector had demonstrated significant interest in the bid,

---

tion, except upon the condition that such Corporation shall surrender all claim to exemption from taxation or from the repeal or modification of its Charter, and that such Corporation shall thereafter hold its Charter subject to the provisions of this Constitution; and any Corporation chartered by this State which shall accept, use, enjoy, or in any wise avail itself of any rights, privileges or advantages that may hereafter be granted or conferred by any general or special Act, shall be conclusively presumed to have thereby surrendered any exemption from taxation to which it may be entitled under its Charter, and shall be thereafter subject to taxation as if no such exemption has been granted by its Charter.
(Emphasis added).

and therefore MEDCO should not have bid on the project, pursuant to § 5–202(b) (mission of corporation includes developing "economic resources in which the private sector has not demonstrated serious and significant interest or development capability [that] would serve the public interest"); and (3) the project was structured under the Golf Course System Agreement to remain permanently as public property, rather than to be turned over to the private sector following its completion as required under § 5–202(c).

*Id.* (alteration in original). As a result, "MEDCO cancelled the issuance of the tax-exempt bonds for the golf course project and requested from the General Assembly relief from the restrictions imposed by law, as well as expanded powers that would permit it to complete the project." *Id.* The General Assembly responded as follows:

On April 20, 2001, . . . signed these revisions into law as Ch. 338 of the Acts of 2001. This legislation authorized MEDCO to undertake projects anywhere in Maryland and not solely in distressed areas (Article 83A, § 5–202(c)(1)), authorized it to compete with private taxpaying enterprises (§ 5–202(c)(5)(i)–(ii)), authorized MEDCO to own for profit enterprises (§ 5–205(16)), removed the requirement that MEDCO turn over its projects to private enterprises upon completion (§ 5–202(c)(2)), and removed the requirement that MEDCO projects be located upon land conveyed to MEDCO by the State (§ 5–201(h)–(i)).[16]

---

**16.** Prior to the 2001 revisions, Art. 83A § 5–202 (2000), entitled "Legislative Intent" provided as follows:

(a) Declarations and findings—In general.—The General Assembly declares and finds that Maryland's economy continues to experience technological change and restructuring. The General Assembly recognizes that, while technological change sometimes results in economic contraction and dislocation, it also affords opportunities to expand productive employment and expand the State's economy and tax base.

(b) Same—Public corporation; purposes; additional findings.—The General Assembly further declares and finds that the establishment of a State public corporation to develop certain vacant or underutilized industrial sites and facilities as well as other economic resources in which the private sector has not demonstrated serious and significant

interest or development capability would serve the public interest. It would complement existing State marketing programs administered by the Department and through the Department's financial assistance programs such as those of the Maryland Industrial Development Financing Authority, the Maryland Industrial Land Act, and the Maryland Industrial and Commercial Redevelopment Fund Act. The General Assembly finds that the State lacks and needs direct property development capability for economic development purposes.

(c) Legislative intent.—The General Assembly intends that the Maryland Economic Development Corporation operate in areas of the State experiencing significant economic dislocation or distress and that it exercise its corporate powers to assist State and local economic development agencies to contribute in the expansion, modernization, and retention of existing Maryland enterprises as well as the attraction of new business to the State. In furtherance of the purposes of this subtitle, it is also intended that the Corporation structure its projects in a manner which accelerates the transfer of facilities and sites into productive use in the private sector and cooperate with private industry councils, representatives of labor, and local governments in maximizing new economic opportunities for the citizens of this State.

In 2001, Art. 83A § 5–202 (2001), was amended to provide as follows:

(a) Declarations and findings—In general.—The General Assembly declares and finds that Maryland's economy continues to experience technological change and restructuring. The General Assembly recognizes that, while technological change sometimes results in economic contraction and dislocation, it also affords opportunities to expand productive employment and expand the State's economy and tax base.

(b) Same—Public corporation; purposes; additional findings.—

(1) The General Assembly declares that the legislative purposes of the corporation are to:

(i) Relieve conditions of unemployment in the State;

(ii) Encourage the increase of business activity and commerce and a balanced economy in the State;

(iii) Assist in the retention of existing business activity and commerce and in the attraction of new business activity in the State;

(iv) Promote economic development; and

(v) Generally promote the present and prospective health, happiness, safety, right of gainful employment, and general welfare of the residents of each of the counties and municipalities of the State.

(2) The General Assembly further declares and finds that the establishment of a State public corporation to acquire, construct, reconstruct, equip, expand, extend, improve, rehabilitate, or remodel projects will:

(i) Serve the public interest by accomplishing one or more of the Corporation's legislative purposes; and

(ii) Complement existing State marketing programs administered by the Department and through the Department's financial assistance programs such as those of the Maryland Industrial Development Financing Authority and the Maryland Economic Development Assistance Authority.

*Id.* at 120, 832 A.2d 207. In *Atlantic Golf*, the Court of Appeals commented on MEDCO's tax exempt status while discussing the creation of MEDCO as follows:

In 1984, the Maryland General Assembly created the Maryland Economic Development Corporation ("MEDCO"), Maryland Code (1957, 1982 Repl.Vol., 1985 Supp.), Article 41, §§ 558 through 573, as a public corporation with the objective of promoting economic development within the state. The Legislature granted MEDCO various powers to carry out its statutory objective, including the power to "borrow money and issue bonds for the purpose of financing or refinancing" the cost of its economic development projects,

---

(3) In addition, the General Assembly finds that the State lacks and needs direct property development capability for economic development purposes. (continued ...)

(c) Legislative intent.—The General Assembly intends that:

(1) The Corporation operate and exercise its corporate powers in all areas of the State;

(2) Without limiting its authority to otherwise exercise its corporate powers, the corporation exercise its corporate powers to assist political subdivisions and State and local economic development agencies to contribute in the expansion, modernization, and retention of existing Maryland enterprises as well as the attraction of new business to the State;

(3) The Corporation cooperate with private industry councils, representatives of labor, and local governments in maximizing new economic opportunities for the citizens of this State;

(4) The Corporation accomplish at least one of the legislative purposes listed in subsection (b)(1) of this section and complement existing State marketing and financial assistance programs by:

(i) Owning projects;

(ii) Owning and leasing projects to one or more persons; or

(iii) Lending the proceeds of bonds to one or more persons to finance or refinance the costs of acquiring, constructing, reconstructing, equipping, expanding, extending, improving, rehabilitating, or remodeling projects owned or to be owned by the person or persons or any combination of them; and

(5) The Corporation not own and operate a project unless:

(i) The Board of Directors of the Corporation finds and determines by resolution that the private sector has not demonstrated serious and significant interest and development capacity to own and operate the project; or

(ii) A representative of a political subdivision or a designated agency or instrumentality of the political subdivision has requested in writing that the Corporation own and operate the project.

> Article 41, § 562(12), and an **exemption from state taxation "with the exception of [certain specified] State and local real estate taxes."** Article 41, § 567. **The Legislature further provided in § 567 that "the bonds of the Corporation and the interest thereon are forever exempt from all State, municipal, and local taxation."**

*Id.* at 117–18, 832 A.2d 207 (footnote omitted) (alteration in original) (emphasis added). *Atlantic Golf* is an opinion regarding MEDCO's ability to issue $17 million in tax-exempt revenue bonds and use the proceeds to construct and operate a golf course for the County, and the comment regarding MEDCO's tax exempt status under to Article 41, § 567 is dicta. The Court of Appeals's decision in *Atlantic Golf* is not dispositive as to the meaning or legislative intent of Econ. Dev. § 10–129(a).

In short, nothing in the Court of Appeals's decision in *Atlantic Golf* supports the proposition that MEDCO is exempt from paying a recordation tax, for the benefit of a private entity, when MEDCO agrees to pay the tax, but the tax is not required to be paid by MEDCO. Econ. Dev. § 10–129(a) leads to precisely the opposite conclusion—*i.e.* when MEDCO is not required to pay the tax but agrees to do so, it may not then claim an exemption.

█ Similarly, we are not persuaded by MEDCO's contention that it is exempt from paying all taxes or assessments on its properties or activities, or any revenue from its properties or activities except as provided in Econ. Dev. § 10–129(b) which states that: "Property that the Corporation sells or leases to a private entity is subject to State and local real property taxes from the time of the sale or lease." According to MEDCO, subsection (a) of Econ. Dev. § 10–129 exempts it from paying any tax except that described in subsection (b)— tax on property sold or leased to a private entity. Econ. Dev. § 10–129(a), by its plain language, however, states, that MEDCO is exempt **"from any requirement** to pay taxes or assessments on its properties or activities, or any revenue from its properties or activities."** Thus, MEDCO must be specifically

required to pay the tax, prior to claiming a tax exempt status. The interaction of Econ. Dev. § 10–129(a) and (b) is, therefore, not relevant in this case. In light of its plain meaning, the language of subsection (a) does not result in MEDCO being exempt from the payment of tax except that described in subsection (b), where MEDCO was not required to pay the tax but nonetheless agreed to pay.[17]

---

17. We are aware of two letters written in 1991, and 2002, by the same Assistant Attorney General stating that a mortgage given by MEDCO to secure bonds, or an indebtedness it has incurred, is not subject to recordation tax. In a letter dated February 6, 1991, the Assistant Attorney General wrote to the Principal Counsel for the Maryland Stadium Authority regarding a "Deed of Trust given by MEDCO to Trustee for Bondholders Recordation Tax." This letter provided that a deed of trust given by MEDCO to a bank, as trustee for certain bondholders, would be exempt from the State recordation tax upon being recorded. In the letter, the Assistant Attorney General stated:

> You have requested advice concerning whether a deed of trust given by [MEDCO] to a bank, as trustee for certain bondholders, would be subject to State recordation tax upon being recorded. Please be advised that, for the following reasons, I have concluded that the deed of trust is exempt from recordation tax.
>
> There is no applicable exemption in the statutes expressly governing State recordation tax, namely Tax–Property Article, Title 12. Section 12–108(a) of that Article only exempts from recordation tax an instrument transferring property or granting a security interest *to*, inter alia, a State agency. That exemption does not apply to an instrument given by a State agency to a private party or parties.
>
> However, Article 83A, § 5–110 exempts MEDCO from paying "any taxes or assessments upon its properties or activities or upon any revenues therefrom", other than real property taxes on property sold or leased by the Corporation to a private entity or entities. One of the authorized activities of the Corporation is the use of a deed of trust granted to a bank or trust company, as trustee, for the purpose of securing bonds issued by the Corporation. Article 83A, § 5–106(k). Thus, the recording of the deed of trust referenced in your letter is an activity of the Corporation that is exempt from taxation under Article 83A, § 5–110.

(Footnote omitted).

In a letter dated February 6, 2002, written to Hans F. Meyers, the Executive Director of MEDCO, the Assistant Attorney General stated that a mortgage given by MEDCO to secure bonds that MEDCO issues, or an indebtedness it incurs, is not subject to recordation tax. The Assistant Attorney General reasoned that:

> As you note in your second letter, Article 83A, § 5–210 exempts from taxes, other than real property taxes, MEDCO and its properties and activities and revenue. Thus, while [Tax–Prop.] § 12–108(a)(1)

In this case, MEDCO, **by agreement,** accepted responsibility to pay: "(a) all filing, registration and recording costs and

> does not exempt from recordation tax the grant of a security interest by a government unit to a private party, MEDCO is exempt from paying such tax on a mortgage given by it to a third party to the extent that such tax is payable by the mortgagor. In 75 *Opinions of the Attorney General* 451 (1990), this office advised that a mortgage or deed of trust granting a security interest to a federal credit union is not covered by the tax exemption afforded such credit unions under 12 U.S.C. § 1768 because the statutory presumption of a 50/50 split of State and local recording taxes under Real Property Article, § 14–104 does not apply to mortgages and deeds of trust; traditionally, the tax imposed upon the recording of such instruments is paid by the mortgagor/grantor, not the secured party/lender. **Thus, if MEDCO is the mortgagor, MEDCO's exemption from paying taxes other than real property taxes would apply to the recordation tax, which is an excise tax.**

(Emphasis added) (footnotes omitted).

We are not bound by the formal opinions of the Attorney General and would afford even less weight to an informal letter written by a single Assistant Attorney General. *Pub. Serv. Comm'n of Maryland v. Wilson,* 389 Md. 27, 57, n. 18, 882 A.2d 849 (2005) ("Although we quote here from the advice letter of the Assistant Attorney General, we afford no enhanced weight to its conclusions and analysis. We have remarked in several instances that, although we may give some consideration to formal opinions of the Attorney General, we are not bound by them."). In the 1991 letter, the Assistant Attorney General concluded that the recordation of a deed of trust is an activity of MEDCO and, therefore, a deed of trust given by MEDCO to a bank, as trustee for certain bondholders, would not be subject to State recordation tax upon being recorded. Subsequently, in the 2002 letter, however, consistent with the statutory construction and relevant case law discussed above, the Assistant Attorney General in effect concluded that MEDCO is exempt only when it is required to pay the tax. The Assistant Attorney General stated in the 2002 letter that, "traditionally, the tax imposed upon the recording of such instruments is paid by the mortgagor ... [t]**hus,** if MEDCO is the mortgagor, [*i.e.* the tax is imposed on MEDCO], MEDCO's exemption from paying taxes other than real property taxes would apply to the recordation tax[.]" (Emphasis added). There is a stark distinction between the blanket exemption the Assistant Attorney General advocates in the 1991 letter, and the exemption based on the mortgagor's tradition of paying the recordation tax outlined in the 2002 letter. Implicit in the Assistant Attorney General's reasoning in the 2002 letter is the conclusion that if MEDCO is the mortgagee and agrees to pay the recordation tax, it would not be exempt from paying the recordation tax. In the 2002 letter, the Assistant Attorney General does not opine that Article 83A, § 5–210, now Econ. Dev. § 10–129, provides a blanket exemption to MEDCO from payment of recordation tax.

fees and all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessment and charges in connection with the recordation or filing of any Loan Documents or related instruments, and any documents in connection with any foreclosure[.]" MEDCO subsequently recorded a deed of trust for the benefit of PNC Bank, and claimed that it was exempt from payment of the recordation tax, pursuant to Econ. Dev. § 10–129. Econ. Dev. § 10–129 provides tax exemption status to MEDCO for any taxes MEDCO is **required** to pay on its properties or activities. MEDCO agreed to pay the recordation tax, even though it was not required to do so. The recordation tax is an excise tax, imposed upon the privilege of recording the deed of trust in favor of PNC Bank, and is not a tax on MEDCO's properties or activities or the revenues therefrom. As stated above, a general rule pertaining to exemptions from taxation is that the exemptions apply primarily to annual property taxes and ordinarily do not apply to excises or taxes which are imposed not in lieu of property taxes, but upon the enjoyment of a privilege.

▆▆▆▆ Maryland appellate courts have also previously held that a tax exemption does not apply when the legal incidence of the tax fails to fall on the party who has the tax exempt status.[18] In this case, the legal incidence of the recordation

---

**18.** The County relies on two Supreme Court cases—*Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941), and *United States v. Fresno*, 429 U.S. 452, 97 S.Ct. 699, 50 L.Ed.2d 683 (1977)—for the proposition that "[t]he statute that establishes an exemption for MEDCO from any requirement to pay tax does not apply to a consensual agreement to pay a tax that the law does not impose on MEDCO." We agree. In *King & Boozer*, the Supreme Court addressed whether the Alabama sales tax with which the seller is chargeable, but which he is required to collect from the buyer, infringes any constitutional immunity of the United States from state taxation. 314 U.S. at 6–7, 62 S.Ct. 43. King & Boozer sold lumber on the order of " 'cost-plus-a-fixed-fee' contractors for use by the latter in constructing an army camp in the United States." *Id.* at 6, 62 S.Ct. 43. The Supreme Court held that the legal incidence of the sales tax did not fall on the United States, and as such the tax was proper. *Id.* at 12–13, 62 S.Ct. 43.

In *Fresno*, the Supreme Court addressed whether "California may tax federal employees on their possessory interests in housing owned and supplied to them by the Federal Government as part of their compensa-

tax does not fall on MEDCO. Rather, the purpose of recording the deed of trust was for the benefit of PNC bank, the entity identified as the beneficiary in the Leasehold Deed of Trust, Assignment and Security Agreement. As this Court explained in *Vournas,* 53 Md.App. at 251, 452 A.2d 1263, "[t]he United States Constitution immunizes the United States and its property from taxation by the States, but it does not forbid a tax whose legal incidence is upon a person doing business with the United States, even though the economic burden of the tax, **by contract or otherwise,** is ultimately borne by the United States." (Emphasis added) (citation omitted). We see no reason to depart from this rationale-the legal incidence of the recordation tax was borne by PNC bank, an entity provided no tax exempt status under Maryland law. MEDCO contractually agreed to be responsible for the recordation tax, and that contractual commitment to pay the tax did not create a "requirement" under Econ. Dev. § 10–129 to pay taxes from which MEDCO is exempt. MEDCO, by agreeing to pay the recordation tax and then claiming tax exempt status, in effect, attempted to convey its tax exempt status to PNC Bank.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED AND VACATED WITH INSTRUCTIONS FOR THE CIRCUIT COURT FOR MONTGOMERY COUNTY TO AFFIRM THE JUDGMENT OF THE MARYLAND TAX COURT. COSTS TO BE PAID BY THE MARYLAND ECONOMIC DEVELOPMENT CORPORATION.**

---

tion." 429 U.S. at 453, 97 S.Ct. 699. The Supreme Court permitted the imposition of a tax on Forest Service employees who lived in federally owned houses in the national forests. *Id.* at 453, 456, 97 S.Ct. 699. The Supreme Court concluded that the " 'legal incidence' of the tax involved in this case falls neither on the Federal Government nor on federal property. The tax is imposed solely on private citizens who work for the Federal Government." *Id.* at 464, 97 S.Ct. 699.